[Civ. No. 1011. Fourth Appellate District.—September 19, 1932.]

SECURITY TRUST & SAVINGS BANK OF SAN DIEGO (a Corporation), Respondent, v. A. H. FROST COMPANY (a Corporation), Appellant.

Harrison G. Sloane for Appellant.

Hamilton, Lindley & Higgins for Respondent.

MARKS, J.—Since June 1, 1925, when the transactions here involved were first undertaken, the corporate names of two of the corporations before us were changed to the Security Trust & Savings Bank of San Diego and A. H. Frost Company, from the Security Commercial Bank of San Diego and the San Diego Beach Company, respectively. No further reference will be made by us to the earlier names.

Under date of June 1, 1925, appellant entered into a subdivision sales contract with Pickering, Incorporated, whereby this corporation agreed to buy and appellant agreed to sell certain real property in the city of San Diego in the manner and upon the terms to be specified in a declaration of trust to be executed by appellant as trustor, the Union Trust Company of San Diego as trustee, and Pickering, Incorporated, as beneficiary. Early in August, 1925, appellant conveyed the real property described in the contract just mentioned to the Union Trust Company of San Diego. A declaration of trust was executed which by reference incorporated into its terms the Pickering, Incorporated, contract and constituted what is commonly known as a subdivision trust, whereby the legal title to the real estate was to remain in the Union Trust Company of San Diego. Sales of subdivided lots were to be made by Pickering, Incorporated, and the proceeds from such sales so divided that appellant would receive its selling price for the property. Pickering, Incorporated, was designated as the beneficiary under this trust. It was provided in the declaration of trust that in case the beneficiary should make default in performing any of the terms of the trust on its part to be performed the

trust could be terminated and the beneficial interest foreclosed by a trustee's sale of the trust property.

Under date of July 3, 1925, appellant entered into a contract with Earl Taylor, which the parties denominated an "Agreement of Settlement", wherein it was recited that Taylor had made the sale of the real property described in the declaration of trust to Pickering, Incorporated, and after reciting various indebtednesses between the parties, struck a balance of $12,456.09 as due and unpaid from appellant to Taylor. In this contract it was provided "that said party of the first part (appellant) will cause to be paid from the proceeds of the sale under said Pickering contract with said A. H. Frost Company, the said sum of $12,456.09 from one-half of the net proceeds from sales under said Pickering contract to be paid to said second party (Taylor) as said money is received to the credit of said first party and after first deducting the first twenty per cent (20%) from said sales payable to said Pickering, Incorporated, as provided in said Pickering contract, until the said sum of $12,456.09 has been paid to said second party, and no payment of same is to be made except as derived from said sales". On December 26, 1925, by a written instrument and for a value received Taylor assigned to Birdie Mae Taylor all his rights under this contract and the money to be derived therefrom. On December 29, 1925, Birdie Mae Taylor executed a similar written assignment to the Citizens Trust & Savings Bank of Los Angeles. By an instrument dated December 23, 1927, the Citizens Trust & Savings Bank of Los Angeles assigned all its rights under the Taylor "Agreement of Settlement" to respondent, which then became and continued to be the holder thereof. This last assignment was evidently not delivered until January, 1928.

On November 12, 1925, appellant addressed a letter to the Union Trust Company of San Diego, the material parts of which are as follows:

"You are administering a certain trust under which the interested parties are the A. H. Frost Company and Pickering Incorporated, which involves the A. H. Frost Company's holdings at Pacific Beach. Under this trust certain payments into the trust are to be disbursed to the A. H. Frost Company.

"We hereby direct that one-half of the net proceeds from sales of the Pickering Incorporated contract be remitted to the Citizens Trust and Savings Bank, 736 South Hill street, Los Angeles, California, until said remittances to said Citizens Trust and Savings Bank have amounted to the sum of $12,456.09.

"It being understood that the first twenty per cent from said sales are payable to said Pickering Incorporated as provided in said Pickering contract, and that no amounts are to be disbursed to the A. H. Frost Company from said sales until the first twenty per cent thereof have been paid to said Pickering Incorporated."

After the execution of the Pickering, Incorporated, contract of June 1, 1925, and the declaration of trust just mentioned, Pickering, Incorporated, apparently entered upon the performance of its obligations under these instruments. It found purchasers for some of the subdivided property but did not actually consummate any sales. For some reason not disclosed by the record this corporation and appellant decided to dissolve the trust in which Pickering, Incorporated, was named as beneficary. This last-named corporation was paid $20,000 and consented to a dissolution of the trust, which dissolution was accomplished about February, 1926. While Taylor knew of this action the Citizens Trust & Savings Bank of Los Angeles had no notice or knowledge of it.

In March, 1926, a second trust was executed by A. H. Frost Company as trustor, Union Trust Company of San Diego, as trustee, and E. A. Walsh, and A. L. Mitchell, as beneficiaries, whereby the two beneficiaries were substituted to all of the obligations, rights and benefits of Pickering, Incorporated, under the original trust. Neither declaration of trust is set forth in the record. Very brief summaries of the documents are inserted instead of exact copies. The second declaration of trust, which we will hereafter refer to as the "Walsh Trust", is described in the record as follows:

"Declaration of Trust, S–7061, Union Trust Company of San Diego, covering the same property and embodying the same terms and provisions of sale and default as the Declaration in favor of Pickering, Incorporated, being Exhibit No. 6, but being in favor of A. H. Frost Company, as payee,

E. A. Walsh and A. L. Mitchell, as beneficiaries, dated March ——, 1926; the same being attached to plaintiff's complaint in this action and referred to therein as Exhibit B.''

The Pickering, Incorporated, declaration of trust, by its express terms incorporated within its provisions the contract of June 1, 1925, between appellant and Pickering, Incorporated, which was the original contract of sale between those parties and under the terms of which the rights and obligations of all the parties connected with these transactions seem to have had their origin. As it affirmatively appears from the record that the Walsh trust embodied ''the same terms and provisions of sale'' as the Pickering, Incorporated, trust we must conclude that the Walsh trust also incorporated within its terms the provisions of the agreement of June 1, 1925, between Pickering, Incorporated, and appellant, and that the real effect of the Walsh trust was to continue in operation the terms and conditions of the contract of June 1, 1925, and the Pickering, Incorporated, trust with the substitution of Walsh and Mitchell in the place of Pickering, Incorporated, the beneficiary in the earlier declaration of trust.

About January 3, 1928, the respondent bank was preparing to take from the Citizens Trust & Savings Bank of Los Angeles an assignment of the interest it had acquired in the proceeds of the sale of the real property described in the declaration of trust and under the original Taylor-A. H. Frost Company contract and the Taylor assignment. Neither of the banks had at that time any notice or knowledge of the cancellation of the Pickering, Incorporated, trust, or the execution of the Walsh trust, which facts were not disclosed to either of them by Taylor, appellant or the Union Trust Company of San Diego until on or about March 27, 1929. Before accepting the assignment from the Citizens Trust & Savings Bank of Los Angeles respondent caused to be prepared and delivered to the Union Trust Company of San Diego by appellant, the following letter:

''San Diego, California, January, 1928.

''Union Trust Co., San Diego, Calif.

''Gentlemen:

''Under date of November 12, 1925, the undersigned company wrote you a letter in which we directed that one-half of the net proceeds from sales of the Pickering Incorporated

contract be remitted to the Citizens Trust & Savings Bank, Los Angeles, until remittances to said bank have amounted to the sum of $12,456.09.

"Our letter to you above referred to and bearing date of November 12, 1925, was intended to be an absolute assignment of one-half of the net proceeds from sales of said Pickering Inc. contract until said remittances amounted to the sum of $12,456.09 and was not intended to be subject to revocation by the undersigned company.

"This letter is to advise you that we received a valuable consideration for the execution of said letter of instructions to you, and that we do hereby declare said instructions to be irrevocable, and instruct you to continue said payments to said Citizens Trust & Savings Bank or to their assignees until said sum of $12,456.09 has been paid in full.

> "Very truly yours,
> "A. H. FROST COMPANY,
> "By A. H. FROST,
> "President.
> "By MARTHA M. FROST,
> "Secretary.

" (Seal) "

As a part of this transaction respondent had prepared and executed by the Citizens Trust & Savings Bank of Los Angeles and delivered to the Union Trust Company of San Diego a letter which in detail referred to the Taylor-appellant "Agreement of Settlement", the assignment by Earl Taylor to Birdie Mae Taylor and by Birdie Mae Taylor to the Citizens Trust & Savings Bank of Los Angeles, the letter of appellant to the Union Trust Company of November 12, 1925, and the assignment by the Citizens Trust & Savings Bank of Los Angeles to respondent, which letter concluded with an order directing the Union Trust Company of San Diego to pay to respondent the moneys accruing under these various documents.

During these negotiations and before the consummation of the assignment to appellant, and on January 13, 1928, the following letter was sent from the then attorneys for appellant to the attorneys for respondent:

"Attorney Gardiner has handed to A. H. Frost Company for execution a letter intended to make irrevocable certain

instructions for remittances arising under sales of Pickering, Inc., contract with A. H. Frost Company.

"We understand that you drafted this letter, and that the bank requires its execution before taking the above mentioned order as collateral security.

"We can obtain execution of this letter for you and the officers of the company are willing to deliver it as soon as Mr. Taylor takes care of the claim of San Diego Lumber Company for $316.78.

"We have prepared suit against Taylor for this amount, and contemplate garnishment proceedings against Union Trust Company for payments arising out of the Pickering, Inc., contract which go to the credit of Taylor. The execution of this proposed letter would apparently make the earlier order irrevocable to the extent where such a garnishment would not be effective. For that reason we will be obliged to hold up the letter until we have made secure the claim of San Diego Lumber Company.

"If Mr. Taylor is willing to give us an order on the funds which your bank expects to loan him we can adjust the matter in that way.

"As you doubtless know, the owners of A. H. Frost Company are closely connected with the officials of San Diego Lumber Company, and have authorized us to handle this situation to the protection of the latter. For that reason we will have to withhold delivery of the letter which you request until Mr. Taylor has voluntarily taken care of the bill or until we have secured a sufficient garnishment of the funds."

Without any knowledge of the cancellation of the Pickering trust and the execution of the Walsh agreement and seemingly satisfied from its investigations and the letters of appellant that it would succeed to Taylor's rights under the original Pickering, Incorporated, trust, respondent accepted the assignment from the Citizens Trust & Savings Bank of Los Angeles as collateral security for a loan of about $7,000 to Taylor. The facts before us would seem to indicate the necessary elements of an estoppel against a defense interposed by appellant in the trial court, but estoppel was neither plead nor were the facts upon which it could be based found in the court below. It does not seem to have been considered at the trial.

After the cancellation of the Pickering, Incorporated, trust and the execution of the Walsh trust the Union Trust Company of San Diego, with the knowledge of appellant, paid to the Citizens Trust & Savings Bank of Los Angeles and to respondent in various amounts the total sum of $3,941.40, out of the moneys which it received from sales of property under the Walsh trust, which sales were made by Walsh and Mitchell.

Walsh and Mitchell became in default in the performance of their obligations under the Walsh trust and early in 1929 these beneficiaries with appellant and the Union Trust Company of San Diego, but without the knowledge or consent of respondent, by contract dissolved the Walsh trust, and the trustee, on the request of appellant, deeded the property involved to Martha M. Frost. No foreclosure proceedings or foreclosure of the trust estate were had as required in the declaration of trust in order to terminate the trust upon default of the beneficiaries.

On March 27, 1929, the Union Trust Company of San Diego notified respondent of the termination of the trust and that future payments to it would be discontinued. Respondent thereupon brought this action and was given judgment against appellant for $8,514.69, the amount unpaid on the original A. H. Frost Company indebtedness to Taylor, as determined in their "Agreement of Settlement". This judgment is under attack here on this appeal.

It is the theory of the respondent that an equitable assignment of the proceeds to be received from the sale of the real property described in the declarations of trust to the amount of $12,456.09 was made by appellant and that the right to receive such moneys and the equitable interest in them passed to respondent by the various assignments which have been mentioned. This theory seems to be supported by the record and the decisions of our courts. In the case of *Goldman* v. *Murray,* 164 Cal. 419 [129 Pac. 462, 463], it was said:

"Touching the evidence establishing such an equitable assignment it is said in *McIntyre* v. *Hauser,* 131 Cal. 11 [63 Pac. 69]: 'In order to constitute an equitable assignment of a debt, no express words to that effect are necessary. If from the entire transaction it clearly appears that the intention of the parties was to pass title to the chose

in action, then an assignment will be held to have taken place.' We have before us, then, a case where the *bona fide* creditor of a corporation takes from it promissory notes evidencing its debt to him, with a belief in the validity of the notes, and passes them on in due course of business to his creditor, the notes being given to and received by the indorsee in payment of the indorser's indebtedness to the indorsee. The assignments of the notes, so far as Bowen and the plaintiff were concerned, carried with them the original indebtedness. (*Redington* v. *Cornwell*, 90 Cal. 63 [27 Pac. 40]; *Knowles* v. *Sandercock*, 107 Cal. 640 [40 Pac. 1047]; 7 Cyc. 816.) The intent of the parties—of Bowen on the one hand to assign and of the plaintiff on the other to accept the assignment of the corporation indebtedness— thus clearly evidenced by the transaction between them, is not affected by the fortuitous circumstance that the notes themselves were invalid as corporation obligations. They still had validity, not as negotiable instruments, but as evidencing the contract between Bowen and the plaintiff, and this contract amounted to a valid equitable assignment. First, since no precise form of words or writing is neces- sary to the establishment of an equitable assignment, it . mattered not whether the notes were or were not the valid obligations of the corporation. They still afforded evidence of what, as between themselves, the plaintiff and the witness Bowen proposed to do and did with the indebtedness owed to the latter by the corporation. Second, as we have seen, the acknowledgment and acceptance by the corporation of the assignment of the debt of Bowen to plaintiff was not essential to the validity of the assignment, and, third, while authority is divided upon the question of the equitable assignability of a portion of a debt or fund before accept- ance, the sounder view we take it is that expressed in 1 Daniel on Negotiable Instruments, section 23, and upon this point we cannot do better than to quote the learned author at length:

" 'This doctrine is clearly correct in so far as it applies to legal assignments. The holder of the bill or order can- not sue the drawee-at-law in his own name, as he would thus divide the cause of action, and leave a balance due the creditor. He cannot sue in the creditor's name, except by his consent, as, at best, he is only entitled to a part of the

debt due him. But it has been held in numerous cases, and we think should now be regarded as law, that a non-negotiable order for part of a fund operates as an equitable assignment *pro tanto*. Clearly this is the case when it has been accepted or assented to by the drawee. And when it has not been accepted, our own view is this: that a non-negotiable order for part of a fund does operate as an equitable assignment *pro tanto* as between the drawer and payee, because obviously so intended. But as between drawer and payee on the one side, and the drawee on the other, it creates no obligation on the latter to pay it, as he has a right to insist on an integral discharge of his debt. And if the creditor give a subsequent order for the whole amount, he may pay it with impunity, as he thus discharges his debt in its entirety at once. But if the payee or indorsee goes into equity, or the parties are brought therein by any proceeding, so that all of them are before the court, the holder of the order may enforce it as an equitable assignment as against all subsequent claimants, whether by assignment from the drawer, or by legal process served upon the drawee.

" 'Mr. Justice Story has stated the principle, as we conceive it, more correctly in his treatise on Equity Jurisprudence, than in the cases hitherto cited; and he there declares that, while a draft for part of a fund operates no assignment at law, the same principle applies in equity to a draft for part of a fund that applies to a draft for the whole and that "in each case a trust would be created in favor of the equitable assignee of the fund, and would constitute an equitable lien upon it." We can perceive no sufficient reason for excluding a bill for a part of a fund, whether it be negotiable or not, from operating as an equitable assignment within the limitations of the text. It would only carry out to its legitimate sequence the theory of the bill.' " (See, also, the cases of *McGown* v. *Dalzell,* 72 Cal. App. 197 [236 Pac. 941], and *Bridge* v. *Kedon,* 163 Cal. 493 [43 L. R. A. (N. S.) 404, 126 Pac. 149].)

It is also self-evident that appellant regarded the Walsh trust as a continuation of the terms of the Taylor "Agreement of Settlement", the appellant-Pickering, Incorporated, contract, and the Pickering, Incorporated, trust, in so far as the rights of Taylor and his assignees to partici-

pate in the proceeds derived from the sale of the real property are concerned. No other view could reasonably explain the letters written by appellant and its acquiescence in the payment to the Citizens Trust & Savings Bank of Los Angeles and to respondent of $3,941.40 derived from the sales of the trust property after the cancellation of the Pickering, Incorporated, trust and the execution of the Walsh trust.

The construction which the parties to a contract place upon its terms is often taken as the best evidence of what they intended by its provisions. In *Mitau* v. *Roddan*, 149 Cal. 1 [6 L. R. A. (N. S.) 275, 84 Pac. 145, 150], it was said:

"Parties to a contract have a right to place such an interpretation upon its terms as they see fit, even when such an interpretation is apparently contrary to the ordinary meaning of its provisions. And in all cases where the terms of their contract, or the language they employ, raises a question of doubtful construction, and it appears that the parties themselves have practically interpreted their contract, the courts will follow that practical construction. It is to be assumed that parties to a contract best know what was meant by its terms, and are the least liable to be mistaken as to its intention; that each party is alert to his own interests, and to insistence on his rights, and that whatever is done by the parties contemporaneously with the execution of the contract is done under its terms as they understood and intended it should be. Parties are far less liable to have been mistaken as to the intention of their contract during the period while harmonious and practical construction reflects that intention, than they are when subsequent differences have impelled them to resort to law, and one of them then seeks a construction at variance with the practical construction they have placed upon it. The law, however, recognizes the practical construction of a contract as the best evidence of what was intended by its provisions. In its execution, every executory contract requires more or less of a practical construction to be given it by the parties, and when this has been given, the law, in any subsequent litigation which involves the construction of the contract, adopts the practical construction of the parties as the true construction, and as the safest rule to be applied in the solution of the difficulty. (*Mayberry* v. *Alhambra etc. Co.*, 125

Cal. 446 [54 Pac. 530, 58 Pac. 68]; *Keith* v. *Electrical Eng. Co.*, 136 Cal. 181 [68 Pac. 598].) ''

By the voluntary termination of the trust in a manner not authorized by and contrary to its terms and the conveyance of the real property to Martha M. Frost, any possibility of respondent receiving further payments from the proceeds of the sale of the trust property was removed. Appellant cannot be permitted to thus defeat its own contract and avoid the payment of its indebtedness.

Judgment affirmed.

Barnard, P. J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on October 11, 1932, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 17, 1932.